**SIGMON COAL COMPANY, INC., Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant.**

**No. 3:00–CV–95.**

United States District Court,
E.D. Tennessee,
At Knoxville.

Aug. 23, 2004.

Herbert S. Sanger, Jr, Charles W. Vanbeke, Wagner, Myers & Sanger, PC, Knoxville, TN, for Plaintiff.

Peter K. Shea, Edwin W. Small, Tennessee Valley Authority, Office of General Counsel, Knoxville, TN, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILLIPS, District Judge.

This is an action for breach of a coal supply contract between Sigmon Coal Company, Inc. (Sigmon), and the Tennessee Valley Authority (TVA). The court tried this civil action without a jury commencing on September 2, 2003. Following the trial, the parties filed proposed findings of fact and conclusions of law. Having heard the testimony at trial, having reviewed the exhibits introduced into evidence, and having considered the parties' proposed findings and conclusions, the following are the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

This action arises out of a 10–year coal supply contract between TVA and Sigmon.

The court's jurisdiction is based upon the Contract Disputes Act of 1978(CDA), as amended, 41 U.S.C. § 601 *et seq.* In 1990, TVA issued a Request for Proposals seeking coal supply offers for various TVA fossil plants over periods ranging up to ten years. Sigmon employed Diversified Energy, Inc., (Diversified) as an agent to assist Sigmon in responding to the Request for Proposals and in contract administration. In November 1990, TVA issued an award letter for the purchase of coal from Sigmon for delivery to TVA's Colbert Steam Plant beginning January 1, 1992.

Subsequent to the November award letter, TVA prepared contract documents in June 1991 and sent those documents for execution to Sigmon's agent, Diversified. Diversified's President, Randy Edgemon, executed the contract documents and returned them to TVA. Section 29 of the contract designates the award letter as one of the documents that constitutes the contract.

The November award letter was initially prepared by TVA's James Bach. The letter was reviewed and edited by TVA's Larry Mize, and was reviewed by attorney Lon Young in the TVA Office of the General Counsel. The November 1990 award letter stated:

> The delivery term of this contract will be for ten (10) years. However, as provided under Section 2, Term, the contract can be reopened by either party ninety (90) days prior to the fifth anniversary date of the commencement of deliveries.

The 1990 Contract documents that followed the November award letter were also prepared by Mr. Bach for TVA. The 1990 Contract documents, on the other hand, contained a reopener provision different from that stated in the award letter:

> *Term.* Deliveries shall begin on January 1, 1992, and shall continue for 10 year(s) unless terminated by agreement or as otherwise provided herein. Provided, however, this contract may be reopened by either party nine (9) months prior to the fifth year anniversary of the delivery commencement date for the purpose of renegotiating price and other terms and conditions, or solely for the purpose of terminating deliveries. **The party desiring to exercise such reopener shall give the other party written notice at least ninety (90) days prior to the anniversary date.** If the reopener provision has been exercised, this contract will terminate on the said anniversary date unless TVA and the Contractor have mutually agreed in writing six (6) months prior to the said anniversary date to continue this contract. Neither party shall be under any obligation or liability to extend this contract if either party desires to terminate deliveries in accordance herewith. (emphasis added.)

For reasons unrelated to the reopener provision, TVA terminated the Contract in 1992 and litigation ensued. That litigation was resolved by a 1994 settlement which resulted in the Contract being reinstated through the issuance of Contract Supplement 18. Supplement 18 modified the reopener provision by deleting the November 1990 award letter from the documents that became the 1994 Contract.

On September 29, 1998, TVA provided written notice to Sigmon that it was reopening the Contract. Sigmon responded that TVA's notice was untimely because under the Contract, as modified by Supplement 18, notice to reopen had to be given ninety (90) days prior to the fourth anniversary. TVA took the position that notice was timely if given nine (9) months prior to the fifth anniversary. The parties negotiated in 1999 for the continuation of the Contract, but did not reach an agreement on a price. Sigmon's lowest offer to

TVA was $27.60 per ton, which TVA rejected because it could purchase comparable coal for lower prices from other suppliers. TVA subsequently gave notice on August 13, 1999 that the 1994 Contract would terminate effective August 15, 1999.

By letter dated September 8, 1999, Sigmon sought a decision from the TVA Contracting Officer (CO) that TVA had breached the Contract by not providing proper notice of reopener and by not negotiating in good faith to continue the Contract. On December 10, 1999, the CO denied Sigmon's request for relief. The instant litigation commenced in February 2000 and was assigned to the Honorable Leon Jordan, United States District Judge.

In a memorandum opinion entered July 16, 2001, Judge Jordan found that the written contract prepared by TVA, as amended by Supplement 18 and subsequent supplements "is the contract between the parties." As amended by Supplement 18, the Contract no longer included the November 1990 award letter and instead contained the reopener provision quoted above, that the

> contract may be reopened by either party nine (9) months prior to the fifth year anniversary of the delivery commencement date for the purpose of renegotiating price and other terms and conditions, or solely for the purpose of terminating deliveries. **The party desiring to exercise such reopener shall give the other party written notice at least ninety (90) days prior to the anniversary date.** (emphasis added.)

The sentence emphasized in bold is at the center of the current dispute between the parties.

The reopener provision in the 1994 Contract carried forward language from the original 1990 Contract. The period of time to give notice of a desire to reopen, the reopener date, and the negotiation period all remained the same as in the 1990 Contract. Supplement 18 specifically deleted from the 1990 Contract the November 1990 award letter which stated that the Contract could be reopened ninety (90) days before the fifth anniversary. (emphasis added.)

With the deletion of the award letter from the Contract, Sigmon understood the reopener provision to set forth a two-step procedure. First, the notice of desire to reopen the 1994 Contract was required to be given 90 days before the fourth anniversary of the Contract. Then, the Contract would actually be reopened and negotiation would begin nine months before the fifth anniversary. TVA took the position that the Contract required notice to reopen to be given nine months prior to the fifth year, and that its September 29, 1998 written notice to reopen the Contract was timely. TVA asserts that the language requiring written notice by a party "ninety (90) days prior to the anniversary date" is in error and does not reflect the parties' understanding as to the reopener provision. In his July 16 opinion, Judge Jordan held that the Contract's Term clause was ambiguous regarding the time for giving notice of the reopener. The undersigned concurred with Judge Jordan's conclusion in a May 2003 opinion.[1]

Based on the evidence presented at trial, the court finds that the Contract documents contained inconsistent provisions regarding both the reopener right date and the notice deadline date. The two material factual issues to be decided are (1) the

---

1. On November 25, 2002, this case was reassigned to Thomas W. Phillips, United States District Judge.

meaning of the term "anniversary date" in the reopener provision, and if TVA breached the 1994 Contract through its August 13, 1999 termination letter, (2) the dollar amount of Sigmon's damages for TVA's breach of the Contract.

As to Sigmon's damages, the evidence showed that TVA contracted for coal to replace the coal which would have been supplied under the terminated 1994 Contract from Coastal Coal Sales, Inc., at $25.25 per ton; from Pittston Coal Sales Corp. at $25.44 per ton; and from Virginia Electric and Power Co. at $26.00 per ton. The parties stipulated that the 1994 Contract price at the time of termination was $29.448 per ton. The parties also stipulated that the base tonnage under the 1994 Contract was 20,000 tons per week subject, however, to TVA's unilateral right to increase that amount by 10% per week or to decrease that amount by 20% per week. The evidence showed that TVA had decreased the tonnage to 16,000 tons per week effective August 6, 1999, prior to termination of the Contract.

### Conclusions of Law

■ Under the CDA, as with contract law in general, the cardinal rule of contract construction is to give effect to the intention of the parties. It is a question of law for the court as to whether a contract provision unambiguously reflects the intention of the parties or whether the disputed term is ambiguous. *Continental Collection & Disposal, Inc. v. United States*, 29 Fed.Cl. 644 (1993); *M.A. Mortenson Company v. United States*, 29 Fed.Cl. 82 (1993).

■ The general approach to resolve a disagreement over the meaning of words in a contract is for the court to follow a two-step process. The court first determines whether an ambiguity exists. *Mortenson*, 29 Fed.Cl. at 96; *Neal & Co. v.*

*U.S.*, 19 Cl.Ct. 463, 471 (1990). Having previously found that an ambiguity exists, the court next determines whether the ambiguity is patent or latent. *Mortenson*, 29 Fed.Cl. at 96. If patent, a plaintiff may have some duty to seek clarification. *Id.* This court (Judge Jordan) held that Sigmon did not have any such duty. If the ambiguity is latent, the contract provision is interpreted against TVA as the drafter, so long as Sigmon's interpretation is reasonable. *Id.* If Sigmon's interpretation as the non-drafting party is reasonable, it must prevail over TVA's, even if TVA's position is more reasonable, since TVA drafted the contract provision. *Neal*, 19 Cl.Ct. at 473. If Sigmon's interpretation is reasonable, Sigmon prevails. *United Pacific Ins. Co. v. United States*, 204 Ct.Cl. 686, 204 Ct.Cl. 938, 497 F.2d 1402, 1407 (1974).

The court has previously found that the definition of the term "anniversary date" as used in the 1994 Contract is ambiguous. More narrowly stated, the issue is whether the term "anniversary date" in the reopener provision means the fourth anniversary date, as Sigmon contends, or the fifth anniversary date, as TVA contends. Supplement 18, which was drafted by TVA amended the Contract by deleting TVA's award letter. Thus, any reference in the 1990 Contract to reopening 90 days before the fifth anniversary was deleted. The amendments to the 1990 Contract state that for either party to properly reopen the 1994 Contract, the party desiring to exercise such reopener shall give 90 days notice prior to the "anniversary date" and then the 1994 Contract shall be reopened nine months prior to the fifth year anniversary.

■ It is well settled that courts are to construe ambiguities against the drafter of a contract, which in this case is TVA. *See Hills Materials Co. v. Rice*, 982 F.2d 514,

516–17 (Fed.Cir.1992) (construing an ambiguous contract clause against the government where the government had drafted the contract). Moreover, under settled principles of construction, the contract must be read as a whole so as to give meaning and effect to all of its provisions. *Diversified Energy Inc. v. Tennessee Valley Authority*, 223 F.3d 328, 339 (6th Cir. 2000).

The first sentence of the reopener provision provides that "this contract may be reopened by either party nine (9) months prior to the fifth year anniversary." The second sentence of the reopener provision then provides that the "party desiring to exercise such reopener shall give the other party written notice at least ninety (90) days prior to the anniversary date." The notice provision does not state the fifth or fourth anniversary. The third sentence of the reopener provision provides that "[i]f the reopener provision has been exercised, the contract shall terminate on the said anniversary date unless TVA and the contractor have mutually agreed in writing six (6) months prior to said anniversary date to continue this contract."

■ If all three sentences of the reopener provision are to be given meaning and harmonized, it must be read to mean that a party desiring to exercise the reopener must give notice 90 days before the fourth anniversary. TVA's interpretation, that notice is required only nine (9) months before the fifth anniversary, would render the 90–day notice provision meaningless. TVA's interpretation thus is not consistent with the entire 1994 Contract reopener provision as a whole while Sigmon's interpretation is consistent with the entire reopener provision—that notice must be given 90 days prior to the fourth anniversary with the reopener period to begin nine months before the fifth anniversary. When interpreting the language of a contract, a court must give reasonable meaning to all parts of the agreement and not render any portion meaningless, or interpret any provision so as to create a conflict with other provisions of the contract. *Continental*, 29 Fed. Cl. at 648.

■ Accordingly, the court finds that pursuant to the 1994 Contract, as written by TVA, the agency was required to give Sigmon notice of TVA's desire to reopen the Contract ninety (90) days prior to the fourth anniversary. In addition, the court finds that TVA breached the 1994 Contract by not giving timely notice to reopen the Contract and terminating the Contract on August 15, 1999. Thus, Sigmon is entitled to damages for the breach.

■ The basic premise of Federal common law is that an award of contract damages should place the injured party in as good a position as if the contract had been fully performed. As the Sixth Circuit stated in *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir.1984):

> [I]n the case of an injury of an economic nature, the injured party is to be placed, as nearly as possible, in the position he would have been in had the wrong not occurred. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

Thus, the nonbreaching party is entitled to damages for its "expectation interest," *i.e.,* damages sufficient to place the nonbreaching party in as good a position as the party would have been had the contract been performed. *In re Highland Superstores, Inc.*, 154 F.3d 573, 580 (6th Cir.1998) (quoting Restatement (Second) of Contracts §§ 344, 347 (1981)). This court has previously found that Sigmon's damages, should liability be found, would be limited to the difference between the contract price and the market value at the times

when and the places where deliveries should have been made. TVA agrees the contract-market value differential is the appropriate measure of damages. Further, the parties stipulated the remaining Contract term was for five (5) years and that prior to termination, TVA had exercised its right to set the scheduled tonnage amount at 16,000 tons per week, which was the amount in effect at the time of the contract's termination.

■ Sigmon asserts that (1) TVA had the unilateral right to increase by 10 percent or decrease by 20 percent the base amount of tonnage to be delivered under the Contract which was 20,000 tons per week; (2) during a portion of the Contract that ran from February 6, 1996 to August 6, 1999, Sigmon had delivered 19,000 tons a week; and (3) after the Contract's termination, TVA procured replacement tonnage of 25,000 tons per week. Based on these facts, Sigmon asserts that the amount of tonnage shipped, had the Contract continued, would have been 22,000 tons per week (20,000 ton base schedule plus a 10 percent increase). The court is not persuaded that TVA would have opted to increase the tonnage under the Contract when it was able to purchase comparable coal at lower prices. The court therefore finds that the remaining tonnage to be shipped under the Contract amounted to 4,160,000 tons (16,000 tons × 52 weeks × 5 years); in other words, the court will adopt the tonnage schedule which the parties stipulated was in effect at the termination of the Contract.

■ As to the Contract price, the parties stipulated that the Contract price for coal at the time the Contract terminated was $29.448 FOB railcar at Sigmon's tipple in Calvin, Virginia. Next, the court must determine the "market value" for coal at Sigmon's tipple. As to market value, the Supreme Court has held that the market value is to be determined "at the times when and the places where deliveries should have been made." *United States v. Burton Coal Co.*, 273 U.S. 337, 340, 63 Ct.Cl. 678, 47 S.Ct. 351, 71 L.Ed. 670 (1927).

■ Sigmon contends that the "market value" is TVA's replacement cost based on a TVA purchase from Virginia Electric Power Company (VEPCO) for coal to be delivered at either the Kelly View or Appalachia rail loadout as opposed to the Calvin tipple. However, the evidence showed that the VEPCO price of $26.00 per ton was not representative of market value because VEPCO was able to take advantage of a special $3.00 tax credit which permitted it to undercut offers by other suppliers. The record also reflects that from January through August 1999, Sigmon made three offers to continue the Contract with TVA at the following prices per ton: $29.25, $27.80 and $27.60. The court finds that the lowest offer price by Sigmon should be used, rather than the VEPCO contract price, because the lowest offer price represents a bona fide offer made by Sigmon to TVA for delivery FOB at Sigmon's tipple; that is, an offer by the contractor made concurrently with the termination of the Contract for continued supply under the Contract to be delivered at the existing Contract delivery point. There is no better evidence of the market value of Sigmon coal at the time and place for delivery. Nor is there better evidence of Sigmon's expectation interest as the recovery is based upon Sigmon's own bid.

Although Sigmon has asserted that the market price is $26.00 per ton, the evidence showed that $26.00 is not the market price for Sigmon coal at the Calvin tipple. Moreover, calculating a recovery based upon a price for comparable coal that Sigmon itself was unwilling to meet

would provide Sigmon with a windfall which the law does not permit.

Accordingly, the court finds that Sigmon's damages should be calculated by multiplying the coal remaining to be delivered (4,160,000 tons) times the per ton difference between the Contract price ($29.448) and Sigmon's best offer ($27.60), or $1.848. Thus, Sigmon's damages are calculated as follows: 4,160,000 × $1.848 = $7,687,680. The court will enter judgment for Sigmon against TVA in the amount of $7,687,680 plus interest as permitted under the CDA.

Finally, TVA argues that as a result of the Contract termination, Sigmon saved the expense of paying a commission to Diversified, which the parties stipulated to be sixty cents per delivered ton of coal. TVA asserts that any award of damages to Sigmon would have to be reduced by that amount per ton. TVA's argument is without merit.

█ TVA did not offer and the record does not contain any evidence that Diversified intends to forgo its commission. Damages recovered under a sale of goods contract may not be reduced by the amount of a broker's commission absent evidence that the broker intends to forgo its commission. *Tri–State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 581 (5th Cir.1988). Diversified is entitled to bring a claim against Sigmon for this commission under Diversified's and Sigmon's brokerage contract, and absent any evidence that Diversified intends not to do so, the sixty cents per ton commission will not be deducted from Sigmon's recovery in this case.

An order consistent with these findings of fact and conclusions of law will be entered.

*ORDER*

Upon consideration of the evidence produced at the nonjury trial held beginning September 2, 2003, and for the reasons set forth in the findings of fact and conclusions of law filed contemporaneously with this order, it is **ORDERED** that Sigmon Coal Company, Inc., recover from defendant Tennessee Valley Authority, damages in the amount of Seven Million, Six Hundred Eighty-seven Thousand, Six Hundred Eighty Dollars ($7,687,680) plus interest as permitted under the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*

**IT IS SO ORDERED.**